1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    PAMELA RENE THOMPSON,              Case No.  13-cv-01389-JCS

            Plaintiff,                  **ORDER GRANTING PLAINTIFF'S**
8                                       **MOTION FOR SUMMARY**
9         v.                            **JUDGMENT, DENYING**
                                        **DEFENDANT'S MOTION FOR**
10   CAROLYN W. COLVIN,                 **SUMMARY JUDGMENT AND**
                                        **REMANDING FOR AWARD OF**
            Defendant.                  **BENEFITS**
11
                                        Re: Dkt. Nos. 20, , 25
12

13

14

15

16   **I.      INTRODUCTION**

17          Pamela Rene Thompson seeks review of the final decision of the Commissioner of the

18   Social Security Administration ("Commissioner") denying her application for disability benefits

19   under the Social Security Act ("SSA").  Plaintiff asks the Court to reverse the Commissioner's

20   denial of benefits and remand with instructions to award benefits, or, in the alternative, for further

21   administrative proceedings.  For the reasons stated below, the Court GRANTS Plaintiff's Motion

22   for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, reverses the

23   decision of the Commissioner and remands for award of benefits.[1]

24

25

26

27   _____

28   [1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
     U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Procedural Background

Plaintiff applied for disability benefits on September 18, 2009, alleging that as of July 19, 2007, she became unable to work because of her anxiety disorder, depressive disorder, degenerative disc disease of the cervical spine, and status post right knee arthroscopy. Administrative Record ("AR") 129.   The claim was initially denied on February 17, 2010, and denied upon reconsideration on August 4, 2010.  *Id.* at 15.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was held on June 14, 2011 in Oakland, California before ALJ Mary P. Parnow ("the June 14 hearing").  *Id.* at 30-69 (hearing transcript). Plaintiff and Vocational Expert Jeff Beeman testified at the hearing.  *Id.*  Plaintiff was represented by Brian Hogan.  *Id.* at 30.  On September 8, 2011, the ALJ issued a decision denying benefits, finding that Plaintiff was not disabled.  *Id.* at 23.

On January 25, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  *Id.* at 1.  The Notice of Appeals Council Action reflects that the Appeals Council considered additional documents submitted after the ALJ's decision and "found this information does not provide a basis for changing the Administrative Law Judge's decision."  *Id.* at 1-2.  The additional documents were included in the Administrative Record as Exhibits 17E, 29F, 30F and 31F.  With the Appeals Council's denial of review, the Commissioner's decision became final.

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the final decision of the Commissioner.    The parties have filed cross motions for summary judgment.

### B.    Plaintiff's Background

Plaintiff was forty-seven years old as of the alleged onset date of her disability, July 19, 2007.  *Id.* at 158 (date of birth 12/20/1959).  Plaintiff's previous work experience included working in retail for sixteen years, product development for three years, and as an art teacher for one year.  *Id.* at 164.  Plaintiff completed three years of college from 1995 to 1998.  *Id.* at 169. Between 2004 and July 19, 2007, Plaintiff worked for furniture retailer Ethan Allen as an Interior Designer, maintaining the showroom and training the design team.  *Id.* at 239.

United States District Court
Northern District of California

1

**C.    Plaintiff's Mental Health Impairments[2]**

2

     **1.    Evidence Submitted Prior to ALJ's Decision**

3

       a.  Dr. Levine

4

       Plaintiff saw psychiatrist Richard Levine between 2006 and 2010.  *Id*. at 563-576.[3]   A

5

Physician's Supplementary Certificate in support of a disability insurance claim completed by Dr.

6

Levine in November 2006 states that Dr. Levine was treating Plaintiff for "Major Depression."

7

AR 294;  *see also* AR 573 (treatment notes from fall 2006 listing diagnosis as "Major Depression,

8

Severe").   His treatment notes also reflect that he was treating Plaintiff for anxiety.  *Id*. at 571

9

(treatment notes for January 31, 2007 describing diagnosis as "Anxious Depression").   The notes

10

reflect that Dr. Levine prescribed a number of medications and discussed their effectiveness and

11

side-effects with Plaintiff.   The content of the treatment notes is summarized below.

12

       Treatment notes from August 29, 2006 (apparently Plaintiff's first visit to Dr. Levine),

13

indicate that Plaintiff was "going through a tough divorce" and "was married 14 years to [a]

14

verbally abusive man."  *Id*. at 576.  Dr. Levine noted that Plaintiff was "focused on [her] career,"

15

had "jumped into" her job at Ethan Allen, asking to take over their Emeryville store.  *Id*.  He noted

16

that on July 18, 2006, she had a mammogram which showed a mass in her breast.  *Id*.  He wrote

17

that Plaintiff complained that she hadn't "been sleeping since January."  *Id*.  He noted that Plaintiff

18

had experienced side-effects from taking Zoloft, including difficulty with swallowing, swelled

19

lips, and diarrhea.  *Id*.  Dr. Levine also noted that Plaintiff had been "on disability" since July 19,

20

presumably of the same year.  *Id*.   He next recorded Plaintiff's comments regarding certain

21

medications she had taken to treat her depression and anxiety.  *Id*. at 575.  When taking Risperdal,

22

Plaintiff "thought [she] was dead."  *Id*.  Plaintiff also thought both Clonazepam and Restoril were

23

24

25

26

27

28

[2] Because Plaintiff does not challenge the Commissioner's decision on the basis of her physical impairments the Court does not summarize the evidence relating to those impairments here.
[3] Dr. Levine's treatment notes indicate that he saw Plaintiff on the following dates:   August 29, 2006; September 4, 2006; September 25, 2006; October 17, 2006; November 13, 2006; December 11, 2006; January 9, 2007; January 17, 2007;, January 31, 2007; February 26, 2007; March 19, 2007; April 30, 2007; May 25, 2007; June 27, 2007; July 27, 2007; August 27, 2007; October 3, 2007; October 26, 2007; November 26, 2007; December 13, 2007; January 14, 2008; February 26, 2008; March 17, 2008; April 9, 2008; May 21, 2008; July 9, 2008; July 18, 2008; September 18, 2008; and November 4, 2010.  *Id*.

"helpful" but "didn't do enough." *Id*. She noted that Xanax "calms [her] down." *Id*. Dr. Levine wrote that Plaintiff had hallucinations when taking Lexapro and noted that Plaintiff had also taken Ambien. *Id*. At the end of the notes from August 29, 2006, Dr. Levine recommended that she continue taking Xanax 0.5 mg and Klonopin 1.0 mg, and that she follow up with him in two weeks. *Id*.

During the September 4, 2006 visit, Dr. Levine recorded that Plaintiff felt "very down, shaky" and "lost, overwhelmed." *Id*. at 574. In addition, Plaintiff reported a reduced appetite and that she had lost between twenty-five to thirty pounds in six weeks. *Id*. Dr. Levine wrote that the Klonopin was helping at night and that Plaintiff was taking Xanax three times a day. *Id*. Finally, he wrote that Plaintiff should start Paxil 5-10 mg, and continue with Xanax 0.5 mg. *Id*.

On September 25, 2006, Dr. Levine wrote that Plaintiff was "feeling very stressed by current circumstances," was "worried about [her] daughter," and had "expressed distress over visits to her father" because she "feels completely rejected by him." *Id*. In addition, Plaintiff was taking Paxil and "tolerating" it, but was not sleeping through the night. *Id*. Plaintiff stated she still had a reduced appetite, and was "eating because [she has] to." *Id*. Dr. Levine noted that she was "anxious, tearful, overwhelmed," but did not have suicidal plans. *Id*. He further noted that his impression was that she had "severe" Major Depression. *Id*. at 573. He wrote that Plaintiff should increase Paxil to 10 mg for three days, then raise it to 20 mg for the fourth day, and take Klonopin 2.0-3.0 mg at night for sleep. *Id*.

On October 17, 2006, Plaintiff was "still feeling fairly overwhelmed." *Id*. Dr. Levine reported that she was taking Paxil 10 mg, Klonopin 2.0 mg, and Xanax 0.5 mg "most days." *Id*. He wrote that he would increase her Paxil prescription to 20 mg. *Id*.

On November 13, 2006, Dr. Levine noted that Plaintiff had started creating artwork again, and that Plaintiff said "it made me feel like me." *Id*. She reported that she was scheduled for a custody hearing over her daughter on December 12. *Id*. She was "feeling a little better" on Paxil 20 mg, she was "exercising, forcing [her]self to go out," and "taking less Xanax." *Id*. Dr. Levine concluded that Plaintiff should continue to take Paxil 20 mg. *Id*.

On December 11, 2006, Dr. Levine met with Plaintiff and discussed her court hearing and

United States District Court
Northern District of California

her artwork. *Id*. at 572. Dr. Levine noted that Plaintiff's mood was improving but that she was stressed and anxious about her court hearing. *Id*. His impression was that she still had Major Depressive Disorder. *Id*. He recommended that she continue to take Paxil 20 mg.

Dr. Levine met with Plaintiff again on January 7, 2007. *Id*. He noted that the week prior she had fallen and broken a bone in her knee. *Id*. In addition, he wrote that Plaintiff said the court hearing was "very upsetting," and her financial support had been cut. *Id*. He recommended that she continue taking Paxil 20 mg and Klonopin 2.5 mg. *Id*.

On January 17, 2007, Dr. Levine wrote that Plaintiff wondered whether she was addicted to Klonopin. *Id*. at 571.

On January 31, 2007, Dr. Levine wrote that Plaintiff reported attending physical therapy for a torn meniscus in her left knee. *Id*. Plaintiff said she was taking Xanax, about 3.0 mg per day, and Paxil 20 mg. *Id*. Dr. Levine's impression was that Plaintiff had anxiety and depression, and he recommended increasing Paxil to 30 mg and Xanax to 0.5 mg. *Id*.

On January 26, 2007, Plaintiff mentioned that she was sleeping better with Xanax 3.0 mg and that she was taking a stress management course at Alta Bates. *Id*. She also noted that she had "been living in fear a long time." *Id*. In addition, Plaintiff was undergoing aqua-therapy twice a week. *Id*. She was feeling hopeful again and was planning to meet a friend to discuss work options. *Id*. Dr. Levine recommended that she continue with Paxil 30g and Xanax 2.0-3.0g. *Id*.

On March 19, 2007, Plaintiff told Dr. Levine that she was trying to "slow down." *Id*. at 570. She reported that she "redid her room" and "had fun doing it," but "can't get back on the treadmill." *Id*. Dr. Levine recommended that Patient continue taking Paxil 30g. *Id*. He also noted that Plaintiff was taking Xanax at 3.0 mg, but had a goal "to reduce her [dose] to 2.5-2.0 mg and taper." *Id*. His impression was that she had Major Depressive Disorder with an anxious feature, and recommended that she continue taking Xanax 2.0-3.0 mg and Paxil 30 mg. *Id*.

On April 30, 2007, Plaintiff told Dr. Levine that a manager at Trader Joe's had asked her to apply for a job. *Id*. Dr. Levine's impression was that Plaintiff had "significant clinical improvement." *Id*. He recommended that Plaintiff reduce her Xanax dose to 1.5-2.0g. *Id*. He also recorded that Plaintiff was taking Paxil 30g. *Id*.

United States District Court
Northern District of California

On May 25, 2007, Plaintiff told Dr. Levine that she wanted to get a job in Los Angeles. *Id.* at 569. In addition, she noted that a stress course she attended that day was "very helpful." *Id.* She reported taking Xanax 2.5 mg. *Id.* Dr. Levine's impression was that Plaintiff's Major Depressive Disorder was improving. *Id.* He recommended that Plaintiff continue Paxil 30 mg. *Id.*

On June 27, 2007, Plaintiff told Dr. Levine that she was continuing her stress-care course, and that her daughter was doing "very well." *Id.* In addition, she was taking Xanax 2.5 mg and Paxil 30 mg. *Id.* Dr. Levine's impression was that her Major Depressive Disorder was "in remission." *Id.* Dr. Levine recommended that Plaintiff continue Paxil 30 mg and Xanax 2.0-2.5 mg. *Id.*

On July 27, 2007, Plaintiff told Dr. Levine that she had worked with a realtor to stage a house and that she had taken her daughter to camp at UC Berkeley. *Id.* at 568. In addition, Plaintiff reported having an interview with a potential employer. *Id.* Dr. Levine recommended that she continue Paxil 30 mg and Xanax 2.0-3.0 mg. *Id.*

On August 27, 2007, Plaintiff noted that she was experiencing "tough job prospects." *Id.* Plaintiff also told Dr. Levine that she had cut back to 2.0 mg of Xanax and Paxil 30g. *Id.* Plaintiff told Dr. Levine that she was "not so fearful anymore," and he noted that her mood was "very upbeat." *Id.* He recommended that she continue the Paxil 30 mg and reduce her Xanax dosage to 1.5 mg "as tolerated." *Id.*

On October 3, 2007, Plaintiff told Dr. Levine that she had gone to Cleveland but "didn't like it." *Id.* at 567. Dr. Levine recommended she continue Paxil 30 mg. *Id.* On October 26, 2007, Plaintiff told Dr. Levine that she was still taking Paxil 30 mg and Xanax 2.5 mg. *Id.*

On November 26, 2007, Plaintiff told Dr. Levine that her ex-husband was "threatening to take her to court." *Id.* She reported needing to increase her Xanax dosage to 3.0 mg per day, and was stable on Paxil 30g. *Id.*

On December 13, 2007, Plaintiff reported that she had gotten a DUI the prior week, and had "ended up in [an] Oakland []holding cell." *Id.* She got an attorney and stated she was "inconsolable." *Id.* Dr. Levine recommended that she continue Paxil 30 mg. *Id.*

On January 14, 2008, Plaintiff told Dr. Levine that she had gotten an attorney and met with a vocational counselor. *Id*. at 566. She felt "encouraged." *Id*. She was stable on Paxil 30g and was taking Xanax 2.5g. *Id*. His impression was that she had Major Depressive Disorder with anxious features. *Id*. He recommended she continue Paxil 30g. *Id*.

On February 26, 2008, Dr. Levine wrote that Plaintiff was "very upset," and had been "up all night vomiting." *Id*. She told Dr. Levine that her "ex-husband had served her with support demands" for $70,000. *Id*. She felt "very fearful" and "overwhelmed." *Id*.

On March 17, 2008, Plaintiff told Dr. Levine that she might need surgery to repair a hernia. *Id*. On April 3, 2008, Plaintiff noted that she would have an ultrasound for possible gallstones. *Id*. at 565. She felt "very anxious" and "fearful," and was "still incapable of returning to work." *Id*.

On May 21, 2008, Plaintiff was stable, but "dealing with ex-husband divorce difficulties." *Id*. She reported that she was taking Xanax at about 2.0 mg but was "not dependent." *Id*. On July 9, 2008, Plaintiff told Dr. Levine that she had gotten a restraining order against her ex-husband. *Id*. She mentioned that her daughter had witnessed an assault on June 17 that had prompted Plaintiff to go to the Alta Bates Emergency Room. *Id*. She told Dr. Levine that at the Emergency Room, doctors reported the assault as domestic violence. *Id*.

On September 18, 2008, Plaintiff told Dr. Levine that she felt "good" because her daughter had a great time at camp. *Id*. at 564. She also mentioned that she was "trying to avoid more abusive relationships," and that she "wants to be more help[ful] to others." *Id*. She reported taking Xanax 3.0g and Paxil 30g. *Id*. Dr. Levine's impression was that she had Major Depressive Disorder with anxious features, and he recommended that she continue her dosage as "above" (presumably what she had reported taking). *Id*. This is the last treatment note that Dr. Levine provided until April 4, 2010.

On April 4, 2010, approximately a year and a half after her previous visit to Dr. Levine,[4]

---

[4] A report by Dr. Tobias, a consultative examiner (discussed below), indicates that during the approximate period in which Dr. Levine apparently was not seeing Plaintiff, Plaintiff was receiving treatment from MFT Sabina Ubell. *Id*. at 439 (stating in a report summarizing results of December 16, 2009 evaluation that Plaintiff "has received counseling for the past 1 1/2 years from

1   Plaintiff reported to Dr. Levine that she was going back to bed in the mornings and struggling with

2   motivation.  *Id.* at 563.  She mentioned that she had lost most of her friends and felt "defeated by

3   [her] inability to find work."  *Id.*  She continued to take Paxil 20 mg for anxiety and depression,

4   and Xanax 2.0 mg for sleep.  *Id.*  Dr. Levine noted that Plaintiff seemed "anxious" and

5   "demoralized by [her] present situation."  *Id.*  He recommended to Plaintiff that she pursue other

6   employment search options, and that she continue Paxil 20g and Xanax 1g.  *Id.* This is the most

7   recent of Dr. Levine's treatment notes in the Administrative Record.

8       On September 16, 2009, during the gap in Dr. Levine's treatment of Plaintiff, he competed

9   a form entitled Medical Source Statement of Ability to Do Work-Related Activities ("September

10  16, 2009 Medical Source Statement").  *Id.* at 435-437.  The instructions on the form ask the health

11  care provider to "assist us in determining this individual's ability to do work-related activities on a

12  sustained basis" and further defines the term "sustained basis" as "the ability to do work-related

13  activities eight hours a day for five days a week, or an equivalent work schedule."  *Id.* at 435.   In

14  response to the first question on the form, Dr. Levine checked the box indicating Plaintiff's

15  impairment affected her ability to "understand, remember, and carry out instructions."  *Id.*

16  However, he checked "None" for all the specific restrictions listed in the follow-on question. [5] *Id.*

17      The second question on the questionnaire asked if "the ability to respond appropriately to

18  supervision, co-workers, and work pressures in a work setting [was] affected by the impairment."

19  *Id.* at 436.  Dr. Levine checked the box to indicate that the impairment did affect Plaintiff's ability

20  to function in this category.  *Id.*  When asked to identify Plaintiff's specific restrictions in this

21  area, Dr. Levine checked "None" for the ability to "[i]nteract appropriately with the public" and

22  [i]nteract appropriately with co-workers."  He checked "Slight" as to the abilities to "[i]nteract

23  appropriately with supervisor(s)," "[r]espond appropriately to work pressures in a usual work

24  setting," and "[r]espond appropriately to changes in a routine work setting."  *Id.*  Dr. Levine

25  _____

26  Sabina Ubell, MFT").  However, there are no records relating to that treatment in the
    administrative record; nor does the ALJ mention any treatment by Ubell.

27  [5] The specific restrictions listed with respect to the ability to "understand, remember, and carry out
    instructions" are as follows: "Understand and remember short, simple instructions";  "carry out

28  short, simple instructions"; "Understand and remember detailed instructions"; "the ability to make
    judgments on simple work-related decisions."  *Id.*

checked "No" in response to the question "Are there any other capabilities affected by the impairment" and left blank the space provided to answer the question "What medical/clinical findings support this assessment." *Id.* Finally, Dr. Levine checked a box indicating that Plaintiff could manage benefits in her own interest. *Id.* at 437.

On July 8, 2010, the California Department of Social Services notified Dr. Levine that Plaintiff had applied for Social Security disability benefits and requested that Dr. Levine provide "existing information" about Plaintiff's alleged impairment and his treatment of Plaintiff. *Id.* at 554. In response, Dr. Levine provided not only the treatment notes summarized above but also a letter dated July 14, 2010, stating as follows:

> To whom it may concern:
>
> Pamela Thompson has a history of anxious depression which I have been treating since 2006. I do not believe that her condition renders her disabled from work. She has ongoing stressors and challenges, but [she] does not meet criteria for disability.
>
> Sincerely,
> Richard Levine, MD

*Id.* at 555.

### b. Dr. Tobias

On December 16, 2009, Plaintiff saw psychologist Faith Tobias, a consultative examiner who conducted a "Psychological Disability Evaluation." *Id.* at 438. According to Dr. Tobias, Plaintiff "reported a history of depression and anxiety since approximately 1993, due to stressful life events including the death of her mother, and physical and emotional abuse by her husband." *Id*. Dr. Tobias described Plaintiff's "current symptoms of depression" as follows:

> The claimant's current symptoms of depression include sadness, tearfulness, low self-esteem, feelings of hopelessness, social isolation, insomnia, decreased energy level, decreased motivation, decreased appetite, and decreased activities of daily living, including sometimes not getting washed and dressed, or not getting out of bed.

*Id*. Dr. Tobias also described Plaintiff's symptoms of anxiety:

> The claimant's symptoms of anxiety include concerns about physical and emotional retaliation by her husband. She stated she no longer feels comfortable going out of her house without her

United States District Court
Northern District of California

> daughter. She reported "fear of males" and fear of relationships.
> She also reported that, due to stress, she will pull her hair out and
> scratch herself during the night. Additional symptoms of anxiety
> include decreased concentration, dry throat, trembling, racing
> heartbeat, and eye twitching.

*Id*. According to Dr. Tobias, Plaintiff stated that her psychiatric symptoms had been exacerbated

in 2009 by physical health problems, in particular, a knee injury resulting from a fall on the stairs

in January 2009 and head, neck and shoulder soreness resulting from two minor car accidents. *Id*.

at 439.

In the section of the report entitled "Mental Status Examination," Dr. Tobias stated that

Plaintiff was "well dressed and groomed," "wore tasteful make-up and jewelry," and had her hair

"pulled . . . back neatly in a ponytail." *Id*. In addition, Dr. Tobias noted that Plaintiff walked

slowly with a limp and used a crutch. *Id*. Dr. Tobias reported that Plaintiff was "alert and

oriented to person, place, time, and situation." *Id*. at 440. Dr. Tobias described Plaintiff's "Short-

Delay Recall" as follows: " 2/3 words recalled. 3/3 words with cues." *Id*. Dr. Tobias wrote that

Plaintiff "demonstrated fluctuating attention and concentration" throughout the examination, was

unable to correctly complete serial sevens, but was able to spell "WORLD" backwards. *Id*.

Plaintiff's "affect was restricted," and "her mood was moderately depressed and anxious." *Id*. Dr.

Tobias noted that Plaintiff's manner was "slightly dramatic," and that she "remained tearful

throughout the interview," and "became abruptly tearful several times during formal testing." *Id*.

In the "Medical Source Statement" section of the report, Dr. Tobias diagnosed Plaintiff

with Major Depressive Disorder and Anxiety Disorder, NOS. *Id*. at 441. Dr. Tobias noted,

however, that her findings should be considered in conjunction with Plaintiff's other medical

records, stating as follows:

> Of note, is that today's evaluation the claimant appeared to be in
> moderate emotional distress. She was difficult to interrupt or re-
> direct and she was frequently tearful. However, chart notes dated
> 9/16/09 indicate indicated a lesser degree of symptomatology. It is
> recommended that the results of today's one-time evaluation be
> considered in conjunction with any available records from the
> claimant's current psychiatric treatment providers, including Sabina
> Ubell, MFT and Richard Levine, MD.

*Id*. The administrative record does not contain any treatment notes or other records of Ubell's

1    treatment; nor does the record contain any "chart notes" from that date by Dr. Levine.

2    Presumably, Dr. Tobias was referring to Dr. Levine's September 16, 2009 Medical Source

3    Statement, described above.

4         In the area of "Cognitive Functioning," Dr. Tobias opined that "clinical observation and

5    claimant's pattern of test performance suggest current cognitive functioning within the average

6    range, with mildly decreased attention, concentration and pace, which appeared to be secondary to

7    her psychiatric symptoms." *Id.*

8         In describing Plaintiff's "[a]bility to Perform in the Workplace," Dr. Tobias found that

9    Plaintiff would have "Moderate" limitations in her "[a]bility to withstand the stress of a routine

10   work day" and to "maintain emotional stability/predictability." *Id*. at 441-442.  She found that

11   Plaintiff would have "Mild to Moderate" limitations as to her "[a]bility to interact appropriately

12   with co-workers, supervisors, and the public on a regular basis." *Id*. at 442.  Dr. Tobias found that

13   Plaintiff had "Mild" limitations as to her "[a]bility to adapt to changes in job routine" and "None

14   to Mild" limitation in her "[a]bility to maintain adequate pace or persistence to perform complex

15   tasks and to maintain adequate attention/concentration" and her "[a]bility to maintain adequate

16   attention/concentration."  Finally, Dr. Tobias indicated that the level of impairment was "None"

17   for "[a]bility to follow/remember simple instructions," "[a]bility to follow/remember

18   complex/detailed instructions," and "[a]bility to maintain adequate pace or persistence to perform

19   one or two step simple repetitive tasks." *Id*.

20        c.   Dr. Kalich

21        Psychologist Lisa Kalich conducted a psychological examination of Plaintiff on June 13,

22   2011. *Id.* at 602.  Plaintiff was referred to Dr. Kalich by her attorney, Mr. Brian Hogan. *Id.*  In

23   her report, Dr. Kalich described Plaintiff as "severely depressed." *Id*. at 605.  She also stated that

24   Plaintiff "reported signs of severe anxiety." *Id*. at 604.  She noted that "as soon as the interview

25   began [Plaintiff] became tearful" and that she "cried intermittently throughout the evaluation." *Id*.

26   at 605.  Dr. Kalich diagnosed Plaintiff with Major Depressive Disorder, Generalized Anxiety

27   Disorder, Panic Disorder without Agoraphobia, and Occupational Problems. *Id*. at 606.  She

28   concluded that Plaintiff "likely experiences moderate to severe impairment with regard to

United States District Court
Northern District of California

11

activities of daily living," and has "mild to moderate impairment in social interactions." *Id*. at

606-07.  In addition, Dr. Kalich observed that during the evaluation, Plaintiff "demonstrated mild

impairment with regard to abilities involving concentration and sustained attention." *Id*. at 607.

### 2.  Evidence Submitted After ALJ's Decision

#### a.  Dr. Barglow

On December 7, 2011, after the ALJ's decision (dated September 8, 2011) but before the

Appeals Council decided whether to review the ALJ's decision, Plaintiff provided a Mental

Residual Function Capacity Questionnaire from Dr. Richard Barglow, who completed the

questionnaire on October 28, 2010.  *Id.* at 608.  Dr. Barglow indicates on the form that he saw

Plaintiff four times in October 2010.  *Id.* at 609.  He described the "clinical findings including

results of mental status examination that demonstrate the severity of [Plaintiff's] mental

impairments and symptoms" as follows:  "Psychomotor Retardation; Can't focus or complete

tasks; Protracted crying; Distraction; Withdrawn.  Pessimistic [and] overwhelmed."  *Id.*

In evaluating Plaintiff's ability to do work-related activities "on a day-to-day basis in a

regular work setting," Dr. Barglow checked  "No useful ability to function" with respect to the

following limitations:  "Maintain attention for 2 hour segment;" "Complete a normal workday and

workweek without interruptions from psychologically based symptoms;" "Perform at a consistent

pace without an unreasonable number and length of rest periods;" "Deal with normal work stress;"

and "Carry out detailed instructions." *Id*. at 611-612.   Dr. Barglow found that Plaintiff's abilities

were "Seriously limited, but not precluded" as to the following categories: "Remember work-like

procedures;" "Sustain an ordinary routine without special supervision;" "Make simple work-

related decisions," "Get along with co-workers or peers without unduly distracting them or

exhibiting extreme behaviors;" "Respond appropriately to changes in a routine work setting;" and

"Be aware of normal hazards and take appropriate precautions."  *Id*.   Dr. Barglow found that

Plaintiff's abilities were "Limited but satisfactory" as to the following categories: "Understand and

remember very short and simple instructions;" "Maintain regular attendance and be punctual

within customary, usually strict tolerances;"  "Ask simple questions or request assistance;"  and

"Accept instructions and respond appropriately to criticism from supervisors."  *Id*.  Finally, Dr.

United States District Court
Northern District of California

1    Barglow found that the following abilities were "Unlimited or Very Good": "Carry out very short

2    and simple instructions" and "Adhere to basic standards of neatness and cleanliness." *Id*.

3            Dr. Barglow listed the "earliest date that the above description of limitations applies" as

4    April 1, 2008. *Id*. at 613.

5                 b.   Dr. Kramer

6            Along with the Mental Residual Function Capacity Questionnaire completed by Dr.

7    Barglow, Plaintiff's counsel also submitted  a letter from Dr. Karen Kramer, dated November 8,

8    2011. *Id*. at 615.  According to Dr. Kramer, Plaintiff first came to her on September 21, 2011 and

9    had met with Dr. Kramer nine additional times after that.  *Id*.  Dr. Kramer further stated that she

10   "plan[ned] to continue seeing [Plaintiff] for an extended period."  *Id*.  According to Dr. Kramer,

11   at the initial visit Plaintiff reported the following symptoms:  "poor sleep, appetite disturbance,

12   episodic crying, low energy, depressed mood, psychomotor agitation, poor concentration, mood

13   lability, irritability, anxiety, and panic attacks." *Id*.  Dr. Kramer also wrote that "by history,

14   [Plaintiff's] symptoms have been present since at least 2007, and appear to have begun some time

15   earlier." *Id*.  She stated that Plaintiff was "being taught anxiety management tools and is being

16   treated with cognitive behavioral therapy techniques and trauma intervention techniques." *Id*.  She

17   went on to opine that Plaintiff was unable to work due to the symptoms listed above.  *Id*.

18                 c.   Dr. Levine

19           On February 13, 2012, Dr. Levine wrote a letter to Plaintiff's attorney, Mr. Hogan, which

20   was also submitted to the agency in support of Plaintiff's claim before the Appeals Council

21   decided whether or not to review the ALJ's decision.  *Id*. at 617-618.   In the letter, Dr. Levine

22   wrote that he had reviewed the following documents:  1) the ALJ's September 8, 2011 decision; 2)

23   the June 13, 2011 Psychological Evaluation by consultative examiner Lisa Kalich; 3) the

24   November 8, 2011 letter from Dr. Kramer; 4) Dr. Barglow's October 28, 2010 Mental Residual

25   Function Capacity Questionnaire;  and 5) Dr. Tobias's December 16, 2009 Psychological

26   Disability Evaluation. *Id*. at 617.  He stated that he found the reports from Dr. Kalich and Dr.

27   Tobias to be "particularly helpful and revealing."  *Id*.  Further, he stated that he had "read the

28   Mental Disorders section of Disability Evaluation Under Social Security  . . . [and] found the

13

section on Assessment of Severity particularly helpful in understanding how Social Security

evaluates an individual's condition. " *Id*. Dr. Levine went on to opine as follows:

> Based on my clinical time spent with Ms. Thompson, the assessments made by
> other clinicians, and my current understanding of how disability is assessed by
> Social Security, I now believe that my initial assessment of Ms. Thompson's
> condition for purposes of disability needs to be amended. For the period during
> which I treated Ms. Thompson for her Major Depressive and Anxiety Disorder, I
> believe that she demonstrated intermittently moderate to marked impairments
> with regard to her activities of daily living, intermittently moderate to marked
> impairments in social functioning, and intermittently moderate to marked
> impairments in her concentration, persistence, and pace. By "intermittent" I
> meant that due to Ms. Thompson's inability to cope with stressors secondary to
> her anxiety, she is likely to experience frequent, brief episodes of decompensation
> when performing even routine, quotidian activities. . . .

> As noted, I base my amended opinion on the clinical time I spent with Ms.
> Thompson for medicine management, as well as the detailed reports that I
> reviewed from other clinicians. If I had reviewed the "Disability Evaluation
> Under Social Security" literature as well as the reports from the psychological
> evaluations prior to offering my initial opinions, my opinion would have been
> stated as above. . . . Previously, on June 14, 2010, when I stated that Ms.
> Thompson "does not meet criteria for disability," I assumed that disability meant
> "total" disability. I understand that my assumption was not correct.

*Id.*

### D.   The Administrative Hearing

At the June 14, 2011 hearing before the ALJ, Plaintiff's counsel described the case as

"primarily a mental health case." *Id*. at 43. Plaintiff proceeded to testify, first describing her

typical day-to-day activities. *Id*. at 44. Plaintiff testified that she had difficulty getting out of bed

in the morning and that her thirteen-year-old daughter was "the primary source of maintaining"

her. *Id*. She testified that she required the help of other parents to get her daughter to school, and

that it was painful for her knowing that her daughter felt Plaintiff's emotions and took on "a lot of

adult emotions and responsibilities." *Id*. at 45. She further described how, due to her depression,

"seven days a week" she would stay in bed most of the morning, feeling unable to get up. *Id*. at

45-46. Plaintiff testified that she had lost a significant amount of weight due to her lack of

motivation to eat, going from a size ten to a size zero. *Id*. at 46.

Plaintiff testified that she used to be a project management director at Ethan Allen, a job

United States District Court
Northern District of California

1  which encompassed global travel and training, requiring her to be on her feet and actively

2  motivating others.  *Id*. at 47.  Plaintiff testified that one day in 2007, she received a call from her

3  medical center telling her she had a spot on her breast; she added that on that same day she was

4  threatened by her husband, whom she was divorcing.  *Id*. at 47-48.  Plaintiff further testified that at

5  around the same time her supervisor threatened to retaliate against her if she did not "lie to the

6  president" of Ethan Allen, making her feel pressure at work.  Id. at 47.  She testified that she

7  started therapy "approximately" at that time and that she had struggled with anxiety since that

8  time.  *Id*. at 49.

9       Plaintiff described the medications she was prescribed for her depression and anxiety as a

10  "Band-Aid."  *Id*.  She testified that she felt like Dr. Levine's main focus was her medication, but

11  that he did not understand that her condition was "beyond medication."  *Id*.  According to

12  Plaintiff, when she complained to Dr. Levine that the therapist who was conducting her "talk

13  therapy" (presumably Ms. Ubell) made her feel like a victim, Dr. Levine told Plaintiff to "stop . . .

14  the talk therapy."  *Id*. at 49-50.   Plaintiff testified that Dr. Levine's approach was simply to

15  increase her medication levels, and that as a consequence she was "dependent totally on Xanax"

16  for her panic attacks.  *Id*. at 50.   Plaintiff testified that she was afraid of being without her

17  daughter, afraid of driving, and experienced feelings of abandonment.  *Id*.  She testified that she

18  had her locks changed and sleeps with a chair propped against her door.  *Id*. at 50.  At the time of

19  the hearing, she felt as if she could not motivate herself to get out of bed, had difficulty with

20  communication, and felt frustrated and short-tempered.  *Id*. at 52.

21       The ALJ then questioned the vocational expert, who began by describing Plaintiff's

22  previous work.  *Id*. at 62.  The ALJ asked if the following hypothetical individual could perform

23  Plaintiff's past work: a 51-year-old individual who was forty-nine at the last insured date, with

24  three years of college and past relevant work as the vocational expert had described, with no

25  limitations on the ability to follow and remember simple or detailed instructions, no limitations on

26  ability to maintain pace or persistence, perform simple, repetitive tasks or complex tasks, but with

27  mild limitations in the ability to adapt to changes in job routine, moderate limitations  on the

28  ability to maintain emotional stability, and mild to moderate limitations on the ability to interact

United States District Court
Northern District of California

15

appropriately with co-workers or supervisors.  *Id*. at 62-63.  The Vocational Expert testified that such an individual could not perform Plaintiff's past work.  *Id*. at 63.

The ALJ next asked the VE if Plaintiff would have any transferrable skills from her past work to lesser skilled jobs.  *Id*. at 64.  The Vocational Expert testified that she would not have any transferrable skills because her past work involved interaction with students and the public, as well as coworkers.  *Id*.  He testified that these kinds of interpersonal skills were impaired by Plaintiff's "moderate limitations in the ability to withstand the stress of a routine day," "moderate limitations in the ability to maintain emotional stability," and "mild to moderate limitation in the ability to interact appropriately with coworkers, supervisors, and the public on a regular basis."  *Id*. at 63-64.  The ALJ then asked if an individual with such limitations could perform "semi-skilled work."  *Id*. at 64.  The vocational expert opined that even for unskilled work, the limitations specified by the ALJ show "significant red flags . . . as far as employability."  *Id.* at 65.

The ALJ then asked if the following hypothetical individual could perform work:

> The individual is capable of simple one to two-step work and can sustain concentration, persistence, and pace for four to eight-hour increments with the customary work breaks.  Would need limited public contact but can interact appropriately with supervisors. . . . [C]apable of adapting to simple one and two-step work with limited public contact.

*Id*. at 66.  The VE opined that there would be some work that such a hypothetical person could do, which would be of low skill level and low public contact.  *Id*. at 67.   In particular, the VE testified that someone with the above impairments would be able to work as an Assembler (734.687-018, sedentary, unskilled, SVP 2), Machine Operator (692.685-130, sedentary, unskilled, SVP 2), or Clerk (249.587-014, sedentary, unskilled, SVP 2) with limited public contact.  *Id*. at 67-68.

## E.    ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such

United States District Court
Northern District of California

16

severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this step.  If it is determined that one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled.  Otherwise, the Commissioner proceeds to Step Four and considers the claimant's residual functional capacity ("RFC") in light of his impairments and whether the claimant can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it").  If the claimant can still perform past relevant work, he is found not to be disabled.  If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis.  20 C.F.R. § 404.1520(a)(4)(v).  At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and

United States District Court
Northern District of California

1    work experience, can perform other jobs in the national economy.  Johnson v. Chater, 108 F.3d

2    178, 180 (9th Cir. 1997).  A claimant who is able to perform other jobs that are available in

3    significant numbers in the national economy is not considered disabled, and will not receive

4    disability benefits.  20 C.F.R. § 404.1520(f).  Conversely, where there are no jobs available in

5    significant numbers in the national economy that the claimant can perform, the claimant is found

6    to be disabled.  Id.

7            Where there is evidence of a mental impairment that allegedly prevents a claimant from

8    working, the Social Security Administration has supplemented the five-step sequential evaluation

9    process with additional regulations to assist the ALJ in determining the severity of the mental

10   impairment.  Clayton v. Astrue, 2011 WL 997144, at * 3 (E.D. Cal. Mar. 17, 2011) (citing 20

11   C.F.R. §§ 404.1520a, 416.920a).  These regulations provide a method for evaluating a claimant's

12   pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a

13   medically determinable mental impairment.  20 C.F.R. § 404.1520a(a).  In conducting this inquiry,

14   the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects

15   of the claimant's symptoms, and how the claimant's functioning may be affected by factors

16   including, but not limited to, chronic mental disorders, structured settings, medication, and other

17   treatment. 20 C.F.R. § 404.1520a(b).  The ALJ must then assess the degree of the claimant's

18   functional limitations based on the individual's impairments.  20 C.F.R. § 404.1520a(c).

19           The limitations identified in subsection (b) of 20 C.F.R. § 404.1520(a) are not a residual

20   functional capacity assessment but are used to rate the severity of mental impairments at Steps

21   Two and Three of the sequential evaluation process.   SSR 96-8p.  The mental residual functional

22   capacity assessment used at Steps Four and Five requires a more detailed assessment in which the

23   ALJ must address the various functions contained in the broad categories found in Paragraph B of

24   the adult mental disorders listings in 12.00 of the Listing of Impairments.  Id.  The listings that are

25   relevant to Plaintiff's claim are 12.04 and 12.06.

26           Section 12.04 describes the criteria for a disabling affective disorder as follows.

27                   12.04 Affective Disorders: Characterized by a disturbance of mood,
                     accompanied by a full or partial manic or depressive syndrome.
28                   Mood refers to a prolonged emotion that colors the whole psychic

United States District Court
Northern District of California

life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App. 1.

Section 12.06 describes the criteria for a disabling anxiety-related disorder as follows:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning; or

20

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.*

If the ALJ determines that a claimant has a medically determinable mental impairment(s), she must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document the findings. 20 C.F.R. § 404.1520a(e)(4). To meet this requirement, the ALJ must "include a specific finding as to the degree of limitation in each of the functional areas," including activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. *Id.*

At Step One, the ALJ found no evidence that Plaintiff engaged in substantial gainful activity since the alleged disability onset date. Id. at 17. Thus, the ALJ concluded that a finding of disability was not precluded on the basis of work activity. *Id.*

At Step Two, the ALJ concluded that Plaintiff had the following severe impairments

United States District Court
Northern District of California

1   through the date last insured: anxiety disorder, depressive disorder, degenerative disc disease of

2   the cervical spine and status post right knee arthroscopy.  *Id*.  The ALJ considered the evidence of

3   record, including Plaintiff's testimony, in concluding the impairments "more than minimally affect

4   her ability to perform basic work activities."  Id.

5          At Step Three, the ALJ found that Plaintiff did not have an impairment, or a combination

6   of impairments, that met or medically equaled the severity of one of the listed impairments in 20

7   CFR Part 404, Subpart P, Appendix 1.  *Id*.  Specifically, the ALJ noted that the severity of

8   Plaintiff's mental impairments, considered singly and in combination, did not meet or medically

9   equal the criteria of listings 12.04 and 12.06, in particular the requirements of Paragraph B.  *Id*. at

10  18.  In activities of daily living, the ALJ concluded that Plaintiff had only mild restriction, citing

11  Plaintiff's ability to care for her daughter and for her own personal needs, including preparing

12  simple meals, driving a car, managing her finances, and attending religious services.  *Id*.

13  Similarly, in social functioning the ALJ found that Plaintiff had mild difficulties based on

14  Plaintiff's close relationship with her daughter and siblings and her attendance at religious services

15  and doctors' appointments.  *Id*.  The ALJ found Plaintiff had moderate difficulties with regard to

16  concentration, persistence or pace based on records provided by Dr. Tobias and Dr. Kalich.  *Id*.

17  The ALJ finally found that Plaintiff had no episodes of decompensation.  *Id*.  The ALJ thus held

18  the Paragraph B criteria were not satisfied because "the claimant's mental impairments did not

19  cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of

20  decompensation, each of extended duration."  *Id*.  The ALJ also held that the paragraph C criteria

21  were not satisfied because the evidence failed to establish the presence of a significant

22  impairment.   Id.

23         At Step Four, the ALJ found that Plaintiff has the residual functional capacity to perform

24  sedentary work as defined in 20 C.F.R. § 404.1567(a) with the ability to perform simple one- or

25  two-step work; that Plaintiff could sustain concentration, persistence, and pace for four to eight

26  hour increments with customary work breaks; that Plaintiff would need limited public contact but

27  could interact with supervisors; and that Plaintiff was capable of adapting to simple one- to two-

28  step work with limited public contact.  *Id*. at 19.  In arriving at this conclusion, the ALJ  followed

United States District Court
Northern District of California

22

a two-step process.  *Id*.  First, she addressed whether there was an underlying medically determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques and which could reasonably produce Plaintiff's symptoms. *Id*.  Second, she evaluated the intensity of the symptoms to determine the extent to which they interfered with Plaintiff's functioning.  *Id.*

As to the first question, the ALJ concluded that Plaintiff had underlying medically determinable physical or mental impairments that could reasonably produce Plaintiff's symptoms. She found, however, that Plaintiff's testimony as to the "intensity, persistence and limiting effects" of her symptoms was "not fully consistent with her allegations of a complete inability to work." *Id*. at 22.  First, she noted that although Plaintiff had testified that she was dissatisfied with the treatment she had received from Dr. Levine, there was no evidence that Plaintiff had sought care from another mental health professional.   *Id*. at 22.   Next, she pointed to Dr. Levine's statement that "he did not believe the claimant's condition prevented her from working."  *Id*.  In addition, the ALJ reasoned, the most recent treatment notes from Dr. Levine stated that Plaintiff was "defeated by her inability to find work and that she would try to find other employment options," "indicating her ability and desire to work."  *Id*.   The ALJ found that Plaintiff's ability to work was also supported by evidence that Plaintiff lives with her minor daughter and "solely cares for her needs."  *Id*.  Thus, she concluded, while Plaintiff may not be able to do past work, she can work consistent with the RFC described above.  *Id*.

In assessing the medical evidence, the ALJ placed "great weight" on Dr. Levine's opinions based on his "longitudinal treating relationship with the claimant."  *Id*.   On the other hand, the ALJ gave no weight to Dr. Kalich's opinion that Plaintiff was impaired due to her mental state because Dr. Kalich only met with Plaintiff on one occasion and did not conduct objective testing. *Id*.  The ALJ also noted that Dr.  Kalich's report "seems to discount" Dr. Levine's treatment notes and his opinion that Plaintiff could work.  *Id*.  The ALJ gave some weight to Dr. Tobias' opinions, citing the fact that Dr. Tobias had examined Plaintiff and conducted multiple tests; the ALJ also found Dr. Tobias' opinions to be consistent with Dr. Levine's treatment notes to the extent she expressly stated that her report should be read in conjunction with the treatment notes.  *Id*.

At Step Five, the ALJ held that through the date last insured, though Plaintiff was unable to perform any past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  *Id*. at 23.  The ALJ relied on the vocational expert's testimony that a person of Plaintiff's "age, education, work experience and residual functional capacity" would have been able to perform work as an assembler, machine operator, or clerk with limited public contact, and that those positions are available in the national economy and the local economy.  *Id*.  Thus, the ALJ found that Plaintiff was "not disabled."  *Id*.

### F.    The Motions

In her summary judgment motion, Plaintiff argues that the Commissioner erred in finding that Plaintiff was not disabled because, in light of the new evidence, the ALJ's decision – which became the final decision of the Commissioner – does not provide specific and legitimate reasons supported by substantial evidence in the record for rejecting the opinions of examining and treating sources.  Plaintiff's Motion at 1.  Plaintiff further contends the ALJ's decision is not supported by substantial evidence given the record that is now before the Court.  *Id*.  In support of her position, Plaintiff relies upon *Brewes v. Commissioner of Social Security* 682 F.3d 1157 (9th Cir. 2012), in which the Court found that where the Appeals Council accepts new evidence and includes it in the administrative record, the court must consider that evidence in determining whether the Commissioner's decision is supported by substantial evidence.  *Id*. at 5.

In the cross-motion for summary judgment, Defendant rejects Plaintiff's argument that the ALJ's decision is not supported by substantial evidence.  Defendant's Motion at 10.  Defendant argues that the ALJ's decision is supported by substantial evidence notwithstanding the opinions expressed by Drs. Barglow, Kramer and Levine in the new documents that were submitted  to the Appeals Council.  *Id*. at 8.  According to Defendant, these new opinions do not require reversal of the ALJ's decision because they are not supported by objective findings.  *Id*. at 11-18.  As to Drs. Barglow and Kramer, Defendant further asserts these opinions have no relevance as neither health care provider had any contact with Plaintiff during the insured period and thus, their opinions are only retroactive opinions.  *Id*. at 11-12.  Defendant also argues that it is "illogical" for Plaintiff to contend that the ALJ should have offered specific and legitimate reasons for rejecting the opinions

United States District Court
Northern District of California

24

1    expressed in the new evidence as that evidence had not yet been submitted when the ALJ issued

2    her decision.  *Id.* at 16.

3    **III.    ANALYSIS**

4        **A.    42 U.S.C. § 405(g)**

5            When asked to review the Commissioner's decision, the Court takes as conclusive any

6    findings of the Commissioner which are free from legal error and supported by "substantial

7    evidence."  42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind

8    might accept as adequate to support a conclusion," and it must be based on the record as a whole.

9    *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere

10   scintilla," *id.*, but "less than a preponderance."  *Desrosiers v. Sec'y of Health and Human Servs.*,

11   846 F.2d 573, 576 (9th Cir. 1988).   Even if the Commissioner's findings are supported by

12   substantial evidence, they should be set aside if proper legal standards were not applied when

13   weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

14   1978).  In reviewing the record, the Court must consider both the evidence that supports and

15   detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

16   1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

17       **B.    Consideration of Evidence Presented for the First Time to the Appeals Council**

18           Section 416.1470 of the Code of Federal Regulations governs the consideration of new

19   evidence by the Appeals Council and provides, in part, as follows:

20       In reviewing decisions based on an application for benefits, if new and material
         evidence is submitted, the Appeals Council shall consider the additional evidence
21       only where it relates to the period on or before the date of the administrative law
         judge hearing decision. . . .
22

23   20 C.F.R. § 416.1470(b).   The Ninth Circuit has held that "when a claimant submits evidence for

24   the first time to the Appeals Council, which considers that evidence in denying review of the

25   ALJ's decision, the new evidence is part of the administrative record, which the district court must

26   consider in determining whether the Commissioner's decision is supported by substantial

27   evidence."  *Brewes*, 682 F.3d at 1159-60.

28

                                                    25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### C.    Weight Given to Opinions of Treating and Examining Physicians

The ALJ must give great weight to the opinion of a treating physician "because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen,* 881 F.2d at 751 (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.1987)).   Consequently, when weighing medical opinions, the greatest weight is normally given to a treating physician.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  The ALJ may only reject the uncontroverted opinion of a claimant's treating physician by presenting clear and convincing reasons for doing so.  *See Magallanes*, 881 F.2d at 751.   For example, the uncontroverted opinion of a treating physician may be rejected where it is "'brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion.'" *Id.* (quoting *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir.1986)).

Where a treating physician's opinion is contradicted by the opinion of an examining physician, the burden is somewhat less:  the "ALJ may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if the ALJ makes 'findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (quoting *Magallanes*, 881 F.2d at 751). The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."  *Id.* "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Id.*

Finally, "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them."  *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995).  Thus, "[a]n examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner."  *Id.*

### D.    Application of Legal Standards

Under *Brewes*, the Court must consider all of the evidence in the administrative record in this case.  Considering the record as a whole, including the amended opinion of Dr. Levine and the

26

1   additional records from Drs. Barglow and Kramer, the Court concludes that the ALJ erred in

2   finding that Plaintiff was not disabled.

3           Having found at Step Four that Plaintiff's mental impairment could reasonably produce her

4   symptoms, the ALJ was required to assess the intensity of the symptoms to determine the extent to

5   which they interfered with Plaintiff's functioning.  The medical evidence before the ALJ consisted

6   primarily of: 1) Dr. Levine's treatment notes, the July 14, 2010 Letter and the September 16, 2009

7   Medical Source Statement; 2) the report of examining physician Dr. Tobias (retained by the

8   agency); and 3) the report of Dr. Kalich (retained by Plaintiff).  These three health care providers

9   offered different opinions with respect to the severity of Plaintiff's symptoms.  For example, Dr.

10  Kalich found Plaintiff had mild to moderate impairment in her social interactions and would have

11  "difficulty developing or maintaining work relationships."  AR 607.   Similarly, Dr. Tobias found

12  that plaintiff had mild to moderate impairment in her "[a]bility to interact appropriately with co-

13  workers, supervisors, and the public on a regular basis."  *Id*. at 442.  Dr. Levine, on the other hand,

14  opined in the September 16, 2009 Medical Source Statement that Plaintiff had no limitations on

15  her ability to "[i]nteract appropriately with the public" and to "[i]nteract appropriately with co-

16  workers," and only "slight" limitations on her ability to "[i]nteract appropriately with

17  supervisor(s)," to "[r]espond appropriately to work pressures in a usual work setting" and to

18  "[r]espond appropriately to changes in a routine work setting."  *Id*. at 436.

19          The ALJ credited Dr. Levine's opinions as to the severity of Plaintiff's impairment over

20  the opinions of Drs. Tobias and Kalich based on Dr. Levine's treating relationship with Plaintiff,

21  properly citing the general rule that the opinions of a treating physician are entitled to greater

22  weight than the opinions of examining physicians when there is a conflict.  Thus, were it not for

23  the new records submitted to the Appeals Council, the decision finding Plaintiff was not disabled

24  likely would have been supported by substantial evidence, notwithstanding the fact that the

25  opinions of both Dr. Kalich and Dr. Tobias pointed toward a contrary conclusion.  Indeed, even if

26  the ALJ had considered and rejected the opinions of Drs. Barglow and Kramer, who also found

27  that the severity of Plaintiff's impairments exceeded that which was found by Dr. Levine, that

28  decision might also have been supported by substantial evidence, given that both doctors provided

United States District Court
Northern District of California

27

1    treatment to Plaintiff for a significantly shorter period of time than Dr. Levine.[6]  The February 13,

2    2012 letter from Dr. Levine that was provided to the Appeals Council, however, is a different

3    matter.

4             As *all* of the health care providers who offered opinions as to the severity of Plaintiff's

5    impairments found that Plaintiff's work-related abilities were more restricted than Dr. Levine

6    originally believed, the only evidence which could provide substantial evidence in support of the

7    Commissioner's denial of Plaintiff's disability claim are the medical records from Dr. Levine that

8    pre-date the February 13, 2012 Letter.  In the February 13, 2012 Letter, however, Dr. Levine

9    abandoned his earlier statements, finding that Plaintiff's impairment was more severe than he had

10   originally stated.   In particular, he now concluded that Plaintiff had moderate to marked

11   impairments as to her activities of daily living, social functioning and concentration, persistence

12   and pace.  He also opined that due to Plaintiff's "inability to cope with stressors secondary to her

13   anxiety, she is likely to experience frequent, brief episodes of decompensation when performing

14   even routine, quotidian activities."  AR 618.  This opinion is in marked contrast with his earlier

15   opinion that Plaintiff had only slight restrictions on her ability to respond appropriately to work

16   pressures in a usual work setting."  AR at 436.

17           The Court rejects the Commissioner's assertion that the Court should disregard the

18   amended opinion of Dr. Levine on the basis that it is unsupported by any objective findings.  As is

19   stated in the letter, Dr. Levine's opinions are based on his clinical time with Plaintiff, which is

20   well documented in his treatment notes.  Therefore, the amended opinion must be considered.[7]

21

22           [6] The Court, however, rejects the Commissioner's assertion that these opinions must be
23   discounted because Drs. Barglow and Kramer did not treat Plaintiff during the insured period.
     The Ninth Circuit has held that "medical evaluations made after the expiration of a claimant's
24   insured status are relevant to an evaluation of the pre-expiration condition."  *Lester v. Chater*, 81
     F.3d 821, 832 (9th Cir. 1996).  Further, "[i]t is obvious that medical reports are inevitably
25   rendered retrospectively and should not be disregarded solely on that basis."  *Smith v. Bowen*, 849
26   F.2d 1222, 1225 (9th Cir. 1988) (citing *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir.1985)).

27   [7] The Court notes, incidentally, that the September 16, 2009 Source Statement and the July 14,
     2010 Letter upon which the ALJ relied were equally brief.  Thus, were the Court to disregard the
28   amended opinion on this basis, it would also reject the ALJ's reliance on the earlier opinions of
     Dr. Levine regarding the severity of Plaintiff's impairment.

United States District Court
Northern District of California

1    Further, the degree of impairment Dr. Levine describes in his amended opinion is

2    consistent with the opinions of Dr. Tobias as to the severity of Plaintiff's impairment.  *See* AR at

3    441-442.  Dr. Tobias' conclusions as to Plaintiff's ability to function in a work setting were, in

4    turn, exactly mirrored in a hypothetical posed by the ALJ to the VE.  *Id*. at  63.  The VE was

5    unable to identify any work that could be performed by such an individual and testified that there

6    would be "significant red flags . . . as far as employability" because the moderate impairment as to

7    stress and emotional stability would be "very disruptive."  *Id*.  at 64-65.

8    Consequently, the Court concludes that the Commissioner's finding that Plaintiff was not

9    disabled is not supported by substantial evidence.

10   **IV.    CONCLUSION**

11   The Court finds that the decision of the Commissioner is not supported by substantial

12   evidence in light of the new evidence submitted to the Appeals Council.  Accordingly, the Court

13   GRANTS Plaintiff's Motion, DENIES Defendant's Motion and reverses the decision of the

14   Commissioner.

15   The Court further concludes that under the circumstances here, additional proceedings

16   would not be useful.  Where "additional proceedings can remedy defects in the original

17   administrative proceeding, a social security case should be remanded."  *Marcia v. Sullivan*, 900

18   F.2d 172, 176-77 (9th Cir. 1990).  However, the Court "may direct an award of benefits where the

19   record has been fully developed and where further administrative proceedings would serve no

20   useful purpose."  *Brewes*, 682 F.3d at 1164 (citation omitted).  In this case, the opinions of Dr.

21   Levine were the primary evidence that supported the ALJ's finding that Plaintiff was not disabled,

22   but these opinions had been retracted by the time the Appeals Council rejected Plaintiff's request

23   for review and the decision became final.  As a consequence, all of the medical providers to assess

24   Plaintiff's impairment were in accord that Plaintiff had at least moderate impairments in social

25   functioning and in coping with stress.  Further, based on the testimony of the VE cited above, it is

26   clear that the limitations associated with Plaintiff's impairment precluded Plaintiff from

27

28

United States District Court
Northern District of California

performing any work.   Therefore, the Court remands this action to the Commissioner for award of benefits.

　　　　**IT IS SO ORDERED.**


Dated: August 20, 2014


_____
JOSEPH C. SPERO
United States Magistrate Judge